RONALD T. WILSON AND MARILYN WILSON, INDIVIDUALLY, AND RONALD T. WILSON AS GUARDIAN AD LITEM FOR WARREN CRAIG WILSON, CHRISTOPHER THOMAS WILSON, AND MATTHEW REID WILSON, MINOR CHILDREN; AND WENDELL SCOTT WILSON, GUY HILL AND MARIE HILL, INDIVIDUALLY, AND GUY HILL AS GUARDIAN AD LITEM FOR EMILY GWEN HILL, MINOR CHILD, AND CRAIG FREDERICK HILL, AND C. N. WHITE, PLAINTIFFS, AND WALTER PAGURA, SHELIA PAGURA, AND BEVERLY C. PAGURA, INDIVIDUALLY, AND SHELIA PAGURA AS GUARDIAN AD LITEM FOR BENTLY PAGURA, MINOR CHILD, INTERVENOR-PLAINTIFFS v. McLEOD OIL COMPANY, INC., A NORTH CAROLINA CORPORATION, LOREN A. TOMPKINS, ADRIAN SIMMONS, GEORGE RIGGAN, AND AMOCO OIL COMPANY, A MARYLAND CORPORATION, DEFENDANTS v. ALAMANCE OIL COMPANY, INC., A NORTH CAROLINA CORPORATION, AND HILDA M. BAXTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE FOR CLIFTON E. BAXTER, DECEASED; WILLIAM THOMAS WARREN, CLYDE H. WARREN, ROBERT C. WARREN, JAMES PAUL WARREN, ODIS H. WARREN, OTIS A. WARREN AND WIFE, GLENDA FAYE WARREN, THIRD-PARTY DEFENDANTS

No. 506A89

(Filed 5 December 1990)

1. **Trespass § 3 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — no continuing trespass — statute of limitations — damages recoverable**

Where plaintiff was informed in September 1979 that testing revealed the presence of gasoline in her well water, plaintiff brought a trespass action on 10 July 1986 for contamination of her well water from leaking underground storage tanks on defendants' lands, and plaintiff forecast sufficient evidence that there was ongoing seepage of gasoline onto her property at the time she filed the action, the ongoing seepage created a renewing rather than a continuing trespass, and her claim is not barred by the three-year statute of limitations for a continuing trespass set forth in N.C.G.S. § 1-52(3). However, since plaintiff filed this action more than three years after she first discovered the contamination of her well, she may collect damages only for the three years immediately preceding the date she filed the action.

**Am Jur 2d, Limitation of Actions §§ 86, 87; Trespass § 65.**

2. **Nuisance § 4 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — nuisance — statute of limitations**

Plaintiff's nuisance claim for gasoline contamination of well water from leaking underground storage tanks was governed

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

by the same statute of limitations as her action for trespass and was not barred by the statute of limitations where she forecast evidence that there was ongoing seepage of gasoline onto her property at the time she filed the action.

**Am Jur 2d, Nuisances §§ 307, 308.**

**Gasoline or other fuel storage tanks as nuisance. 50 ALR3d 209.**

**3. Limitation of Actions § 4.2 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — strict liability — negligence — statute of limitations**

Plaintiff's claims for gasoline contamination of her well water from leaking underground storage tanks based on strict liability under N.C.G.S. § 143-215.93 and on negligence were barred by the three-year statute of limitations of N.C.G.S. §§ 1-52(2) and 1-52(5), respectively, where she waited longer than three years after discovering the contamination to file her action.

**Am Jur 2d, Pollution Control §§ 575, 576.**

**4. Limitation of Actions § 5 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — statute of limitations**

The claims of two families for gasoline contamination of their well water from leaking underground storage tanks on defendants' lands were not barred by the statute of limitations where they filed this action less than three years after they were notified by government agents in May 1984 that test results proved that their water was contaminated by gasoline. The statute of limitations did not begin to run from the time the families first began to notice that something was wrong with their water where they were doing everything they could do to get NRCD to continue to test their water even though NRCD was telling them that the tests did not indicate gasoline contamination, they then asked the county health department to retest their water, and it was this agency which finally detected the gasoline contamination in 1984, since they did not know that they had a claim for contamination of their water prior to testing by the health department.

**Am Jur 2d, Pollution Control §§ 575, 576.**

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

5. **Limitation of Actions § 5 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — intervenor plaintiffs — statute of limitations**

The claims of the intervenor plaintiffs for gasoline contamination of their well water were not barred by the statute of limitations where their forecast of evidence clearly showed that they did not have any notice of any contamination until 1985, and they filed a motion to intervene in the action against defendants in December 1987.

**Am Jur 2d, Pollution Control §§ 575, 576.**

6. **Limitation of Actions § 5 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — ten-year statute of repose**

Claims against one defendant individually and as personal representative of the estate of her husband for gasoline contamination of well water from leaking underground storage tanks were barred by the ten-year statute of repose of N.C.G.S. § 1-52(16) where defendant and her husband sold their property containing the storage tanks more than 10 years before plaintiffs filed this action.

**Am Jur 2d, Pollution Control §§ 575, 576.**

7. **Negligence § 5 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — gasoline contamination of well water — strict liability claims — statute of repose**

Strict liability claims for gasoline contamination of well water under N.C.G.S. § 143-215.93 against an oil company which serviced gasoline tanks on one piece of property and which owned another piece of property containing gasoline storage tanks and later serviced those tanks for a subsequent owner were barred by the ten-year statute of repose of N.C.G.S. § 1-52(16) where the oil company's last acts with respect to both properties occurred more than ten years prior to the filing of this action by plaintiffs and the oil company thus had no "control" over the gasoline within the meaning of the strict liability statute at any time less than ten years before the action was filed.

**Am Jur 2d, Pollution Control §§ 575, 576.**

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

**8. Fixtures § 1 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — underground storage tanks — not improvements to realty — contamination of well water — statute of repose inapplicable**

The installation of underground gasoline storage tanks did not constitute improvements to real property within the meaning of the six-year statute of repose of N.C.G.S. § 1-50(5) where the tanks were installed by an oil company which provided gasoline for the owner of a store on the property; the presumption that the tanks were to become a part of the real property did not arise because they were not installed by the owner of the land; the installation contract provided that the tanks would remain personal property and not become a part of the real estate; the store owner was not responsible for the repair and maintenance of the tanks; and the tanks were removed from the land at the termination of the contract. Therefore, the shortened liability period of § 1-50(5) did not apply in an action against the oil company president for gasoline contamination of well water.

**Am Jur 2d, Fixtures §§ 42, 43; Pollution Control §§ 570, 575, 576.**

**9. Fixtures § 1 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — underground storage tanks — contamination of well water — statute of repose exclusion**

Assuming arguendo that the installation of underground gasoline storage tanks constituted improvements to real property, the six-year statute of repose of N.C.G.S. § 1-50(5) for a defect or unsafe condition of an improvement to real property did not apply to an action against former owners of the property for contamination of well water because of the exclusion set forth in subsection (d) where the forecast of evidence shows that, although the tanks were already in place when the former owners bought the property, they knew that the tanks were on the property and reasonably should have known that the tanks were leaking if they had performed their duty to inspect the tanks.

**Am Jur 2d, Fixtures §§ 42, 43; Pollution Control §§ 570, 575, 576.**

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

**10. Corporations § 15 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — contamination of well water — liability of corporate president**

The president of a corporation could be sued in his individual capacity for the torts of nuisance and trespass arising from the contamination of plaintiffs' well water by gasoline leaking from underground storage tanks installed and maintained by the corporation at a convenience store where the president personally participated in the activities surrounding the delivery and sale of gasoline at the store property in that he signed the contract which allowed the corporation to install the tanks on the property; he generally oversaw the conducting of business there by the corporation as well as by another company which serviced the tanks and equipment and performed repairs; and he signed the papers arranging for deliveries of gasoline to the property, supervised the account, and was the person contacted about a loss of gasoline from the tanks. Furthermore, conflicting explanations as to whether the loss of gasoline resulted from a spill or theft were sufficient to withstand a motion for summary judgment as to the president's personal liability for nuisance and trespass.

**Am Jur 2d, Corporations §§ 1877, 1878.**

**11. Corporations § 15 (NCI3d); Waters and Watercourses § 3.2 (NCI3d) — contamination of well water — statutory strict liability — liability of corporate president**

Defendant corporate president may be liable to plaintiffs for gasoline contamination of their well water under the statute providing strict liability for any "person having control over oil or other hazardous substances," N.C.G.S. § 143-215.93, where plaintiffs' forecast of evidence tended to show that the contamination was caused by gasoline leaking from underground storage tanks installed by the corporation on property formerly used for a convenience store, and that defendant had "control" over gasoline placed in the tanks in that he arranged the contracts, oversaw the business dealings, and personally participated in the activities surrounding the delivery of gasoline to the convenience store property.

**Am Jur 2d, Corporations §§ 1877, 1878.**

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

12. **Waters and Watercourses § 3.2 (NCI3d)— gasoline contamination of well water — evidence of three sources — sufficient forecast of causation**

Where plaintiffs' forecast of evidence in an action to recover for gasoline contamination of their well water shows that there are three sources of contamination, the forecast is sufficient to survive summary judgment as to each source. Plaintiffs in this case forecast sufficient evidence of causation through an NRCD report that their wells are contaminated by gasoline and that defendants' underground storage tanks are probable sources of the contamination.

Am Jur 2d, Pollution Control §§ 580, 583-585.

13. **Waters and Watercourses § 3.2 (NCI3d)— gasoline contamination of well water — forecast of evidence of sources — flow direction of aquifer**

The forecast of evidence of two families was sufficient to show that underground storage tanks on one piece of property could be a source of gasoline contamination of their well water where a groundwater contour map of the area prepared by NRCD indicates that the flow direction of the upper aquifer goes from this property directly toward plaintiffs' properties. However, plaintiffs' forecast of evidence was insufficient to support a finding that underground storage tanks on a second piece of property could be a source of the gasoline contamination where it tended to show that their wells are located uphill from the tanks on this property, and there was no forecast of evidence tending to support plaintiffs' theory that there may be a lower aquifer with a different flow direction than the upper aquifer shown on the NRCD map and that this lower aquifer might have brought gasoline to their wells.

Am Jur 2d, Pollution Control §§ 580, 583-585.

14. **Rules of Civil Procedure § 15.1 (NCI3d)— denial of motion to amend to add defendants — misapprehension of law — remand for reconsideration**

Where the appellate court has held that several of plaintiffs' claims survived summary judgment, and it appears that the trial court denied plaintiffs' motion to amend the complaint to include as defendants certain persons who were already third-party defendants under the mistaken belief that none

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

of plaintiffs' claims were valid and that granting the amendment would result in unnecessary delay and additional expense to the parties, the court's order will be vacated and the cause remanded for reconsideration of plaintiffs' motion to amend.

**Am Jur 2d, Parties §§ 182, 196, 198, 202.**

Justice MEYER dissenting.

ON appeal pursuant to N.C.G.S. § 7A-30(2) and discretionary review of the decision of the Court of Appeals, 95 N.C. App. 479, 383 S.E.2d 392 (1989), setting aside orders entered by *Allen, J.,* in the Superior Court, ALAMANCE County, on 8 April 1988 granting summary judgment for defendant Adrian Simmons, on 11 April 1988 granting summary judgment for defendant Loren A. Tompkins, on 12 April 1988 granting summary judgment for the Warren third-party defendants, and on 14 April 1988 entering summary judgment for the estate of George Riggan; and affirming the orders entered by *Allen, J.,* in the Superior Court, ALAMANCE County, on 8 April 1988 granting summary judgment for third-party defendant Alamance Oil Company, on 11 April 1988 denying plaintiffs' motion for partial summary judgment, on 12 April 1988 denying plaintiffs' motion to amend their complaint, and on 12 April 1988 granting summary judgment for Hilda Baxter, individually and as personal representative for Clifton E. Baxter, deceased. Heard in the Supreme Court 10 April 1990.

*Smith, Patterson, Follin, Curtis, James, Harkavy & Lawrence, by Byran E. Lessley, for plaintiff and intervenor plaintiff-appellants.*

*Hatch, Little & Bunn, by Lucy W. Everett and David H. Permar, for defendant-appellants and appellees McLeod Oil Company, Inc., and Loren A. Tompkins.*

*Glover & Peterson, P.A., by James R. Glover, for defendant-appellant and appellee Estate of George Riggan.*

*Mark E. Fogel for defendant-appellant and appellee Adrian F. Simmons.*

*Henson Henson Bayliss & Sue, by Jack B. Bayliss, Jr., for third-party defendant-appellee Alamance Oil Company, Inc.*

*Carruthers & Roth, P.A., by Kenneth R. Keller and Grady L. Shields, for third-party defendant-appellees Otis A. Warren and Glenda Faye Warren.*

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

FRYE, Justice.

Due to the large number of plaintiffs and defendants in this case, we will begin with a short procedural history to briefly explain the positions of the parties involved in this appeal. The original plaintiffs in this action, the Wilson family, the Hill family, and Ms. White, filed a complaint on 10 July 1986 against McLeod Oil Company, Inc., Loren A. Tompkins, Adrian Simmons, George Riggan, and Amoco Oil Company. This complaint alleged that defendants were liable for the contamination of plaintiffs' wells with gasoline. Defendants filed third-party complaints against Hilda Baxter, individually and as representative of the Estate of Clifton E. Baxter; Alamance Oil Company, Inc. (Alamance); and the Warren family.

On 1 December 1987, the Pagura family filed a motion to intervene as plaintiffs in the action, and this motion was granted in an order entered on 7 March 1988. On 22 March 1988, the original plaintiffs and intervenor plaintiffs filed a motion to amend their complaints to include third-party defendants, the Warrens and Alamance, as defendants. This motion was denied. Plaintiffs and intervenor-plaintiffs voluntarily dismissed their claims against McLeod Oil and Amoco Oil after discovering that these companies had not serviced the property in question. Midway Oil Company (Midway), which is a sister company to McLeod Oil, provided gasoline to some of the tanks, but Midway is not a defendant in this action. Midway is a defendant in a separate action.

Defendants and third-party defendants all filed motions for summary judgment. Plaintiffs and intervenor-plaintiffs filed a motion for partial summary judgment. The trial judge denied plaintiffs' motion for partial summary judgment and granted summary judgment as to all defendants and third-party defendants.

Defendants and third-party plaintiffs McLeod Oil Company and Loren Tompkins gave notice of appeal to the Court of Appeals as to the orders granting summary judgment in favor of Hilda Baxter, Otis and Glenda Warren, and Alamance. Adrian Simmons gave notice of appeal to the Court of Appeals as to summary judgment granted in favor of Alamance and Hilda Baxter. Defendant George Riggan died during the course of this action, and his estate was substituted as a defendant and third-party plaintiff. The Estate of George Riggan appealed the grant of summary judgment in favor of Loren Tompkins, Adrian Simmons, Hilda Baxter, the Warrens, and Alamance. The Riggan Estate later withdrew

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

its appeal as to the Warrens except for Otis and Glenda Warren. Plaintiffs and intervenor plaintiffs gave notice of appeal as to the summary judgments in favor of Loren Tompkins, Adrian Simmons, George Riggan, Alamance, and Otis and Glenda Warren. Plaintiffs and intervenor-plaintiffs also gave notice of appeal of the denial of their motion to amend their respective complaints.

In its majority opinion, the Court of Appeals held that the trial court correctly entered summary judgment for the third-party defendants. The majority of the panel further held that the trial court correctly entered summary judgment in favor of all defendants as to Ms. White's claims against them. The Court of Appeals reversed the summary judgment granted in favor of defendants Loren Tompkins, Adrian Simmons, and the Estate of George Riggan. *Wilson v. McLeod Oil Co.*, 95 N.C. App. 479, 493, 383 S.E.2d 392, 400 (1989). Judge Wells, dissenting in part, concluded that summary judgment was properly entered for Loren Tompkins and that summary judgment was improperly entered in favor of Otis and Glenda Warren, third-party defendants. *Id.* at 494, 383 S.E.2d at 400 (Wells, J., dissenting). Plaintiffs and intervenor-plaintiffs and defendants Adrian Simmons, McLeod Oil Company, Loren Tompkins, and the Riggan Estate all filed notices of appeal from the decision of the Court of Appeals and petitioned this Court for discretionary review of additional issues. This Court granted all the petitions for discretionary review on 7 December 1989.

This case was before the trial judge on motions for summary judgment filed by defendants and third-party defendants and on plaintiffs' motion to amend the complaint and motion for partial summary judgment. Summary judgment is properly granted only if the evidence before the court indicates that there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law. *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 274 S.E.2d 206 (1981). In ruling on defendants' and plaintiffs' motions for summary judgment, the trial judge had before him, in addition to the pleadings, fifteen affidavits, several exhibits, and the depositions of fifteen witnesses. We will review the forecast of evidence as revealed in the materials before the trial judge to determine if the Court of Appeals was correct in reversing in part and affirming in part the orders of summary judgment granted by the trial court in favor of defendants and third-party defendants. We will also consider whether the Court of Appeals erred in affirming the denial of the motion to amend as to the Warrens and Alamance.

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

The four plaintiff families (the Wilsons, Hills, Ms. White and the Paguras) reside in Alamance County near the intersection of State Road 1735, known as Sandy Cross Road, and State Road 1737, known as Hopedale Road. What was once a convenience store known as the Mini-Mart is located on a tract of land at the southwest corner of this intersection. This tract of land has had several owners since 1965 and is presently owned by the Estate of George Riggan. Clifton and Hilda Baxter purchased this property on 7 May 1965 and owned it until they sold it to Adrian Simmons, one of the original defendants in this action, on 26 January 1976. Ms. Baxter is a third-party defendant in this action both as an individual and as personal representative of her late husband, Clifton Baxter.

At the time the Baxters purchased the property, three underground storage tanks, a five-hundred-and-fifty-gallon tank, a one-thousand-gallon tank, and a two-thousand-gallon tank, were located on the northwest side of the building. In her affidavit, Ms. Baxter asserts that Alamance owned the tanks at the time she and her husband bought the property, and in her deposition, she stated that she thought that Alamance owned the tanks. The Baxters operated an automobile repair garage and body shop in the basement of the building and a grocery store on the main floor of the building. The Baxters sold gasoline from the site until 1974, and they did not purchase any gasoline from Alamance after its last delivery to the site on 5 April 1974. At that time, Alamance removed the pumps, but the three underground storage tanks were not removed. Alamance claims that it did not own the tanks on the Baxter property, rather the tanks were a part of the real property when the Baxters bought it. From the evidence presented with the motion for summary judgment, it appears that these tanks were not used for selling gasoline again after the Baxters stopped selling gasoline from them in 1974. The subsequent owners of the property, Adrian Simmons and George Riggan, did not sell gasoline from these tanks.

When Adrian Simmons purchased this property from the Baxters, he operated a convenience store on the main floor of the building and rented the basement, where the Baxters had operated the garage, to a company which made plastic parts. On 15 March 1976, Simmons entered into an agreement with Midway whereby Midway would install underground storage tanks as well as pumps on the property, and Simmons would lease the tanks and pumps from Midway. Loren Tompkins, one of the original

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

defendants in this action, signed this contract as Midway's representative. The agreement further provided, "Title to all gasoline so delivered shall remain in SUPPLIER until the gasoline is withdrawn from the underground storage tanks by DEALER." These tanks were located on the southwest side of the building. Simmons sold gasoline from the Midway tanks until 26 January 1979 when he closed the store on the property. Midway removed its underground storage tanks shortly after Simmons stopped selling gasoline.

While Simmons owned the property, Midway suffered a loss of some of the gasoline from the tanks at the Simmons property. In her deposition, Marie Hill, a former employee at Simmons' convenience store and one of the original plaintiffs, related that sometime in the fall of 1978 there was a loss of some one thousand to two thousand gallons of gasoline from one of the underground storage tanks. Ms. Hill related that she had seen some people digging around one of the Midway tanks after she heard about the loss and that the dirt around the tank was wet and smelled of gasoline.

Tompkins testified in his deposition that he remembered the report of an unaccounted for loss of gasoline at the Mini-Mart property, but he did not remember the details. He recalled that they locked the pumps, which entails putting a lock device on the surface opening for the tanks, and did not have any other problem with loss from the tanks after that measure was taken.

At the time this action was filed, this property was owned by George Riggan and is presently owned by his estate, which is still a defendant in this action. George Riggan bought this property in July 1981 from Adrian Simmons. By the time Riggan purchased this property, Midway had already removed its tanks, and the only underground storage tanks remaining on the property were those which had been used when the Baxters were selling gasoline. Riggan never sold gasoline from this site.

The other real estate of concern in this case is called the Warren property. This property is located on the north side of Sandy Cross Road and to the east of the intersection of Sandy Cross Road and Hopedale Road. Alamance, which also provided gasoline to the Baxters, purchased this site in January 1968 and sold it 21 September 1971 to J. R. Warren who died later that year. When Alamance purchased the property, two underground storage tanks were already in place on the property, but Alamance did not sell gasoline from the site while it owned the property.

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

At his death, J. R. Warren left the property to his six sons, William Thomas Warren, Robert C. Warren, James Paul Warren, Otis A. Warren, Odis H. Warren, and Clyde L. Warren. Five of the brothers conveyed their interest in the property to their brother Odis Warren. Odis Warren leased the property, which included a convenience store, to J. K. Saunders who sold gasoline from the site. This gasoline, supplied to Saunders by Alamance, was stored in the tanks which were already present on the property. Saunders stopped selling gasoline and operating the convenience store in March 1973. Alamance did not deliver gasoline to that site after March 1973. Alamance removed the pumps from the site but did not remove the underground storage tanks. Odis Warren conveyed his interest in the property to Otis and Glenda Warren on 26 September 1974. Otis and Glenda Warren have used the building on the site for storage and have never sold gasoline from that location.

The four plaintiff families all live in the vicinity of the intersection of Sandy Cross Road and Hopedale Road. Ms. White's land is located on the south side of Sandy Cross Road and is adjacent to the property currently owned by the Riggan Estate, which is located at the intersection. The Wilsons' property is located on the west side of Hopedale Road south of the property currently owned by the Riggan Estate. The Wilsons' property is adjacent to both Ms. White's property and the property owned by the Riggan Estate. The Hills' property is located on the south side of Sandy Cross Road directly across from the property currently owned by Otis and Glenda Warren. The Hills' property is located east of the intersection of Sandy Cross Road and Hopedale Road. The Paguras' property is located adjacent to and on the east side of the Hills' property.

In September 1979, plaintiff White contacted the Alamance County Health Department (ACHD) concerning possible contamination of the well water which supplied her home. ACHD took samples from Ms. White's well and found the presence of gasoline-like hydrocarbons in the samples. In November 1980, ACHD contacted the Groundwater Section of the Winston-Salem Regional Office of the Division of Environmental Management of the North Carolina Department of Natural Resources and Community Development (NRCD). The Winston-Salem office began an investigation of the two wells on the site of the property then owned by Adrian Simmons and at the well located on Ms. White's property. All were found to be contaminated, the suspected source being the tanks located

on the then Simmons property. In July 1985, as a result of this investigation, a Notice of Violation of the Oil Pollution and Hazardous Substances Control Act was issued to Adrian Simmons, George Riggan, and Loren Tompkins.

By 1982, the Hills and the Wilsons had begun to notice that their well water was smelling like gasoline. Both families contacted the Winston-Salem office to have their wells tested, but the first report which they received from NRCD informed them that the water contained grease and oil, but it was not contaminated with gasoline. Since the gasoline odor and taste did not go away, both families requested additional testing. The subsequent reports also related that the well water samples taken from these homes did not contain gasoline. The Wilsons and the Hills contacted ACHD which also sampled the well water. In June 1984, ACHD notified the Hills and the Wilsons that their well water contained gasoline.

In September 1986, the Winston-Salem office began another investigation of the area for possible sources of the contamination. This investigation involved the drilling of nine monitor wells on the sites of the property now owned by the Riggan Estate and the property now owned by Otis and Glenda Warren as well as the property owned by Ms. White, the Hills, and the Wilsons. After the wells were dug and the data collected, a Report of Investigation was written which included the following information under the heading "RESULTS":

*Groundwater Monitor Wells*

A total BTX (Benzene, Toluene, Xylene)[1] concentration of 5,230 ug/1 (ppb) was present in monitor well B7, located in front of the abandoned store on the O. A. Warren property. A total BTX concentration of 65,600 ug/1 was present in monitor well B10, located on the Mini-Mart property at the site of the McLeod Oil Company USTs. No BTX was detected in the other monitor wells. Slight concentrations of petroleum hydrocarbons were detected in monitor well B2, located behind the Mini-Mart; monitor well B3, located on the Wilson property; monitor well B11, located on the Long property and intended to be the upgradient monitor well; and monitor well B13, located in the front yard of the Hill home. No volatile

---

1. Benzene, Toluene, and Xylene are liquid aromatic hydrocarbons used as blending agents in gasoline.

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

organic compounds were detected in monitor well B5, located on the Long property near the intersection of SR 1735 and SR 1737; monitor well B4, located in the front of the Mini-Mart; and monitor well B12, located on the Mini-Mart property at the site of the excavated Alamance Oil Company USTs. Laboratory results are summarized in Table 1, with copies of laboratory analyses provided in Appendix 4.

There are two primary groundwater flow directions at the investigation site: from northwest to southeast (from the Warren property to the Hill property) and from north-northeast to south-southwest (from the mini-mart to the Wilson and White properties) (Figure 5).

The hydraulic gradient is 1309 feet/mile between monitor wells B7 and B13, and 239 feet/mile between B4 and B3.

*Water Supply Wells*

Fluctuating concentrations of varying gasoline constituents were detected in VOA samples collected from the White, Wilson, and Hill water supply wells in February, 1985, June 1986, and April, 1987. The concentration of volatile organic compounds in these samples varied from 0.06 ppb to 490 ppb in the White well, from 0.14 ppb to 580 ppb in the Wilson well, and from 0.11 ppb to 14 ppb in the Hill well. Specific compounds identified and concentrations detected are summarized in Table 1.

The following information was in the report under the heading "CONCLUSIONS":

The results of this investigation indicate multiple contamination sources for this incident:

1. USTs at the abandoned store on the O.A. Warren property, evidenced by 5,230 ppb BTX in MW-B7;

2. McLeod Oil Company USTs at Simmons Mini-Mart, evidenced by 65,600 ppb BTX in MW-B10;

3. Alamance Oil Company USTs at Simmons Mini-Mart, evidenced by 1,670 ppb BTX in HA-3 and 5,700 ppb BTX in HA-4.

As noted earlier, the tanks which were owned by Midway were taken out of the ground shortly after Midway stopped selling

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

gasoline to the site on 26 January 1979. The three underground storage tanks on the northwest side of the property presently owned by the Riggan Estate, which we will refer to as the Alamance tanks, were removed in July 1987. Stephen Kay, who works for NRCD, arrived at the site shortly after these tanks were removed. After he arrived, he noticed a gasoline odor near the hole from which the tanks had been removed. In his deposition, he stated, "You could notice it [odor of gasoline] at the land surface, approximately five to ten feet before you got to the edge of the pit."

Kay reported that he used a Hnu photo-ionizer to perform several soil analyses in the hole where the tanks had been. These tests found between three parts per million (ppm) to one hundred seventy-two ppm of volatile organic vapors in the tank excavation pit. The laboratory analyses of these soil samples showed that they contained between 1670 ppm[2] and 6270 ppm of petroleum hydrocarbons. In an attempt to find the edge of the contamination, other pits were dug about fifteen feet away from where the tanks had been removed, but the soil around these pits still contained an odor of gasoline. In his report, Kay further stated that the contamination "is strongly associated with the seasonal high $H_2O$ table." He observed that the seasonal high water table was located approximately six feet below the surface of the ground.

Laboratory analyses of the contents of the tanks which were removed revealed diesel fuel in the five-hundred-and-fifty-gallon tank, leaded gasoline in the two-thousand-gallon tank, and an undetermined gasoline product in the one-thousand-gallon tank. However, as noted earlier in the results of the testing from the monitor wells which were dug at the site, the well which was closest to the location of these particular tanks, monitor well 12, did not show the presence of any BTX at the time it was tested. When the tanks were removed, Kay made a brief visual inspection of the tanks. He found a hole about an inch and a quarter long and about a quarter inch to three-eighths inches wide in the five-hundred-and-fifty-gallon tank. The one-thousand-gallon tank had a hole in it that was approximately an eighth of an inch round. Kay did not observe a hole in the two-thousand-gallon tank.

---

2. The Report of Investigation filed by NRCD reports this figure in terms of parts per million in one part of the report and in terms of parts per billion in another part of the report.

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

The two underground storage tanks were removed from the Warren property on 10 October 1987. Kay was present when these tanks were removed. When he arrived, workers were pumping a liquid from the tanks before they were extracted from the ground, but Kay did not determine what that liquid was. As the tanks were unearthed, Kay noticed a gasoline odor in the soil where the tanks were being removed, but he did not test the soil samples taken from this site. Kay made a visual inspection of these two tanks, and he did not find any visible holes, but he did not inspect the entire tank because the tanks had dirt covering them after they were unearthed. No other pits were dug at this site. As noted earlier in the "Conclusions" found in the report issued by the NRCD, the monitor well at the Warren site was contaminated with BTX.

In addition to being present when the underground storage tanks were unearthed at the two sites, Kay also constructed a groundwater contour map of the area. This map shows the flow direction of the top level of the water table in the area based on the data collected from the monitor wells and the topography of the area.

While plaintiffs and intervenor plaintiffs have presented five issues in their brief on appeal, the issues in general are whether the Court of Appeals was correct in reversing the trial court's grant of summary judgment in favor of Simmons, Tompkins, and the Riggan Estate and in affirming the trial court's grant of summary judgment in favor of the third-party defendants, Alamance, Otis and Glenda Warren, and Hilda Baxter, individually and as the personal representative of her husband's estate. We must also consider whether the Court of Appeals correctly found no abuse of discretion on the part of the trial court in denying plaintiffs' and intervenor plaintiffs' motion to amend their complaints to include Alamance and Otis and Glenda Warren as defendants. In examining these issues, we look to the appropriate statutes of limitations and repose as well as the statutory basis for plaintiffs' and intervenor plaintiffs' complaints, N.C.G.S. § 143-215.93, and all of the plaintiffs' common law claims of negligence, trespass, and nuisance.

As the Court of Appeals correctly noted, the appropriate place to begin is with the issues concerning the statute of limitations and the statute of repose. We conclude that the Court of Appeals

erred in holding that Ms. White's common law claims of trespass and nuisance are barred by the statute of limitations. However, Ms. White's statutory claim based on N.C.G.S. § 143-215.93 is barred by the statute of limitations found in N.C.G.S. § 1-52(2), and her common law negligence claim is barred by the statute of limitations found in N.C.G.S. § 1-52(5).

The statute of limitations is three years for the following actions:

(2) Upon a liability created by statute, either state or federal, unless some other time is mentioned in the statute creating it.

(3) For trespass upon real property. When the trespass is a continuing one, the action shall be commenced within three years from the original trespass, and not thereafter.

. . . .

(5) For criminal conversation, or for any other injury to the person or rights of another, not arising on contract and not hereafter enumerated.

. . . .

(16) Unless otherwise provided by statute, for personal injury or physical damage to claimant's property, the cause of action, except in causes of actions referred to in G.S. 1-15(c), shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent to the claimant or ought reasonably to have become apparent to the claimant, whichever event first occurs. Provided that no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action.

N.C.G.S. § 1-52 (1983).

[1] Ms. White was told by ACHD in September 1979 that its testing revealed the presence of gasoline in her well water. Ms. White did not bring this action until 10 July 1986 which is more than three years from the time she found out about the contamination. The Court of Appeals held that the presence of gasoline in Ms. White's water was a continuing trespass, the statute of limitations found in § 1-52(3) began to run when she first discovered the gasoline in her water in 1979, and therefore her claim was barred by the running of the statute of limitations. *Wilson v. McLeod Oil Co.*, 95 N.C. App. at 488, 383 S.E.2d at 397. In support of this conclusion, the Court of Appeals cited *Matthieu v. Gas Co.*,

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

269 N.C. 212, 152 S.E.2d 336 (1967), for the proposition that the presence of the gasoline was a continuing trespass because it has continued patently and without interruption since it was discovered by testing in 1979. *Id.* The Court of Appeals concluded that the presence of the gasoline was not a recurring trespass as defined in *Galloway v. Pace Oil Co.*, 62 N.C. App. 213, 302 S.E.2d 472 (1983); and *Oakley v. Texas Co.*, 236 N.C. 751, 73 S.E.2d 898 (1953).

We first note that *Matthieu* does not involve the issue of when the statute of limitations begins to run in a trespass case because *Matthieu* concerns a cause of action for negligence rather than trespass. *Matthieu*, 269 N.C. 212, 152 S.E.2d 336. We also note that while N.C.G.S. § 1-52(3) uses the term "continuing trespass," the statute does not define this term. *See* N.C.G.S. § 1-52 (1983). Thus, we must look to other case law to ascertain the meaning of the term "continuing trespass."

*Oakley*, cited by the Court of Appeals as defining recurring trespass, was similar to the present case in that it involved an action for pollution of a well caused by leaking underground storage tanks. *Oakley*, 236 N.C. 751, 73 S.E.2d 898. However, it does not provide much guidance for the present case because in *Oakley* the owner of the tanks dug them up and replaced them on three different occasions in an effort to correct the leak. *Id.* at 752, 73 S.E.2d at 898. This Court concluded that digging up the tanks and replacing them with new leaking tanks constituted "recurring acts of negligence or wrongful conduct on the part of the defendant . . . each causing renewed injury to his property." *Id.* at 753, 73 S.E.2d at 899. *Oakley* did not specifically address the issue of whether the seepage of gasoline from one piece of property to another for a period of years, as in this case, constitutes a continuing trespass.

Since we find no cases in our jurisdiction which deal directly with the question of whether this seepage of gasoline, which may last for an extended period of time causing gasoline to accumulate in the underground water supply of another, is a continuing trespass, we look to the common law of trespass involving similar, but not identical, situations. Several older cases have addressed the issue of whether an action was barred by a statute of limitations for a continuing trespass involving the diversion of water onto the land of another. *See Duval v. Atlantic Coast Line Railroad Co.*, 161 N.C. 448, 77 S.E. 311 (1913); *Roberts v. Baldwin*, 151 N.C.

407, 66 S.E. 346 (1909); and *Spilman v. Navigation Co.*, 74 N.C. 675 (1876). In *Spilman*, for example, defendant had built a canal which deteriorated to the point that water from the canal oozed through the canal banks and over plaintiffs' land. *Spilman*, 74 N.C. at 676. The jury awarded damages to plaintiffs for the three years prior to filing the lawsuit. However, defendant argued that the first flooding occurred more than three years before the action was filed, and therefore the action was barred by the statute of limitations. *Id.* at 678. This Court held that plaintiffs' claims were not barred by the statute of limitations. *Id.* In so holding, the Court gave the following explanation of why the action was not barred:

> The defendant's illustration is worth preserving for its amusing fallacy: "Suppose he had lamed the plaintiff's horse more than three years ago, and he had continued lame ever since; the action would be barred. So, as he first injured the plaintiff's land more than three years age, and it has continued injured ever since, the action is barred." The fallacy is in not drawing the distinction between a *single* act of injury and *continuous* acts. In our case, he flooded the land more than three years ago, it is true; and for that the action is barred; but he has also continued to flood it anew every day within three years, and for that the action lies.

*Id.* (emphasis in original).

This Court again addressed the issue of whether a trespass on land is barred by the three-year statute of limitations for continuing trespass in *Roberts v. Baldwin*, 151 N.C. 407, 66 S.E. 346. In *Roberts*, defendant constructed a ditch which diverted water on plaintiff's land, and plaintiff brought an action to recover annual damages for the loss of crops and for permanent damages to the land. *Roberts*, 151 N.C. at 408, 66 S.E. at 346. Defendant pleaded the three-year statute of limitations for a continuing trespass as a defense to plaintiff's claim. *Id.* This Court concluded that while the ditch was dug more than three years before plaintiff brought his claim and while the ditch had been continuously there, this was not a continuing trespass because the ditch was on defendant's land and because "[t]he trespass is the pouring down of water upon the plaintiff's land, which comes down at regular periods." *Id.* at 409, 66 S.E. at 346. *Roberts* relied on *Spilman* even though the water in *Spilman* continuously dripped on plaintiff's land and

the water in *Roberts* was a problem only after each rain. This Court held, "[t]he trespass is not a continuing one, for it does not accrue from a completed act done more than three years ago but by floodings repeatedly occurring within that time." *Id.* at 409, 66 S.E. at 347.

*Duval v. Atlantic Coast Line Railroad Co.*, 161 N.C. 448, 77 S.E. 311, stated the general rule for trespass which involves diversion of water onto another's property.

> As a general rule . . . the injury caused by wrongfully causing ponding or diverting water on the land of another, causing damage, is regarded as a renewing rather than a continuing trespass, and, unless sustained in a manner and for sufficient length of time to establish an easement, damages therefor, accruing within three years next before actions brought, can be recovered, though the injury may have taken its rise at a more remote period.

*Id.* at 449-50, 77 S.E. at 311. *Duval* was relied upon in *Whitfield v. Winslow*, 48 N.C. App. 206, 268 S.E.2d 245, *disc. rev. denied*, 301 N.C. 405, 273 S.E.2d 451 (1980). In *Whitfield* the defendant constructed a dam on his property in 1968 and modified it in 1970, causing the creation of a pond on plaintiff's property. *Whitfield*, 48 N.C. App. at 207, 268 S.E.2d at 246. Plaintiff did not file an action against defendant until 1979, and the issue before the Court of Appeals was whether plaintiff's claim was barred by the statute of limitations in § 1-52(3). *Id.* The Court of Appeals concluded, "[s]ince a portion of plaintiff's property is alleged to have remained submerged even at the commencement of this action, his cause of action is not barred on the face of the pleadings." *Id.* at 208, 268 S.E.2d at 247.

In the present case, tests revealed that Ms. White's well remained contaminated with gasoline as of the filing of this action in 1986. Gasoline was found in the dirt surrounding the Alamance tanks and the tanks on the Warren property when they were unearthed, indicating that the seepage from the Warren property and the property owned by the Riggan Estate had not stopped at the time this suit was filed. The seepage of gasoline into Ms. White's underground water is more like the oozing of water from the deteriorating canal in *Spilman* than the laming of a horse used in *Spilman* as an example of a continuing trespass. The tanks here, like the ditch in *Roberts*, were located on defendants' land, and

the ongoing seepage of gasoline into plaintiff's water supply is the trespass in the present case just as the "pouring down of water upon the plaintiff's land" was the trespass in *Roberts*. *Roberts*, 151 N.C. at 409, 66 S.E. at 346. As with the cases where the diversion of water caused water to accumulate on another's property, the ongoing seepage of the gasoline into Ms. White's water creates, in the language of *Duval*, "a renewing rather than a continuing trespass." *Duval*, 161 N.C. at 450, 77 S.E. at 311.

We conclude that Ms. White has forecast sufficient evidence that there was ongoing seepage onto her property at the time she filed this action, and thus the trespass was not a continuing trespass as that term is used in N.C.G.S. § 1-52(3). Therefore, her cause of action is not barred by the statute of limitations for a continuing trespass found in N.C.G.S. § 1-52(3). However, we note that since she filed this action more than three years after she first discovered the contamination of her well, she may only collect damages for the three years immediately preceding the date she filed this action. *See Duval v. Atlantic Coast Line Railroad Co.*, 161 N.C. at 450, 77 S.E. at 311.

[2]   Ms. White's action for nuisance is governed by the same statute of limitations as her action for trespass. *See Anderson v. Waynesville*, 203 N.C. 37, 164 S.E. 583 (1932). "Continuous injuries caused by the maintenance of a nuisance are barred only by the running of the statute against the recurrent trespasses; and mere inaction on the part of the plaintiff will not defeat his right unless it has continued long enough to effect a change of title." *Id.* at 45, 164 S.E. at 587. Thus, as with her action for trespass, Ms. White's action for nuisance is not barred by the three-year statute of limitations.

[3]   While Ms. White does have a cause of action for trespass and nuisance, she has waited too long to bring an action under N.C.G.S. § 143-215.93. The "Oil Pollution and Hazardous Substances Control Act of 1978" found in Article 21A of Chapter 143 of our General Statutes does not contain a provision for a statute of limitations within the act itself. *See* N.C.G.S. § 143-215.75 to § 143-215.104 (1987 & Cum. Supp. 1989). Therefore, the three-year statute of limitations found in § 1-52(2) applies to Ms. White and bars her claim against all the defendants under the statute because she waited longer than three years after discovering the contamination to file her action.

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

Ms. White's negligence claim is likewise barred by the statute of limitations found in § 1-52(5). Once again, she waited more than three years after discovering the contamination to file an action for negligence, and the statute provides that an action must be filed within three years of discovery of the damage. *See Matthieu v. Gas Co.*, 269 N.C. 212, 152 S.E.2d 336.

[4] Defendants argue that the claims of the Hills and the Wilsons are barred by pertinent subsections of N.C.G.S. § 1-52. Defendants base this argument on statements made in the depositions of family members in both families that they stopped using the water from their well before they were officially told that their well water was contaminated. Defendants claim that the statute of limitations should begin to run from the time the families first began to notice that something was wrong with their water. However, the forecast of evidence is clear that they were assured by agents of the state on several occasions prior to May 1984 that their water was not contaminated by gasoline. Furthermore, the Hills and the Wilsons were doing everything that they could do to get NRCD to continue to test their water even though NRCD was telling them that the tests did not indicate gasoline contamination. Dissatisfied with the reports that they were getting from NRCD testing, the families asked ACHD to retest their water, and it was this agency which finally detected the gasoline contamination in 1984. Prior to the determination by the ACHD that their water was contaminated, the Hills and the Wilsons did not know that they had a cause of action for contamination of their water. The Hills and the Wilsons filed this action on 10 July 1986 which was less than three years after they were notified by government agents in May 1984 that test results proved that their water was contaminated with gasoline. We agree with the Court of Appeals that none of the claims of the Hills and Wilsons are barred by the statute of limitations.

[5] As for the claims of the Pagura family, the intervenor-plaintiffs, the forecast of evidence is clear that they did not have any notice of any gasoline contamination until 1985. They filed a motion to intervene in December 1987, clearly within the three-year statute of limitations found in § 1-52. Thus, the claims of the Pagura family are not barred by the statute of limitations.

[6] The Court of Appeals was also correct in dismissing the third-party complaint against Hilda Baxter, individually and in her capacity as personal representative of the estate of her husband, and

the third-party complaint against Alamance. These claims are barred by the statute of repose found in § 1-52(16), which bars an action filed "more than 10 years after the last act or omission of the defendant giving rise to the cause of action." N.C.G.S. § 1-52(16) (1983). The Baxters sold their property to Adrian Simmons on 26 January 1976, and plaintiffs' original complaint was not filed until 10 July 1986, more than ten years after the Baxters last owned the property. Therefore, the last act or omission by the Baxters, based on the forecast of evidence presented on the motion for summary judgment, was when they sold the property on 26 January 1976, more than ten years before plaintiffs filed this action. Thus, the Court of Appeals correctly upheld the lower court's order dismissing the third-party complaint against the Baxters.

[7] Alamance was involved with both pieces of property. Until 5 April 1974, Alamance serviced tanks at the property where the Baxters sold gasoline, and from January 1968 to 21 September 1971 Alamance owned the property referred to as the Warren property. Alamance also provided gasoline for the tanks on the Warren property until March 1973 when the tenant there stopped selling gasoline. Thus, Alamance's last act of providing gasoline to the Mini-Mart property was on 5 April 1974, and Alamance's last act with regard to the Warren property was in March 1973. Both of these dates are more than ten years prior to the filing of this action by the plaintiffs, and, as with the case of the Baxters, the action is therefore barred by the statute of repose found in § 1-52(16).

Third-party plaintiffs argue that Alamance is liable under the strict liability provisions of N.C.G.S. § 143-215.93. That statute provides:

Any person having control over oil or other hazardous substances which enters the waters of the State in violation of this Part shall be strictly liable, without regard to fault, for damages to persons or property, public or private, caused by such entry, subject to the exceptions enumerated in G.S. 143-215.83(b).

N.C.G.S. § 143-215.93 (1987). "Having control over" is defined in N.C.G.S. § 143-215.77(5) as follows:

"Having control over oil or other hazardous substances" shall mean, but shall not be limited to, any person, using, transferring, storing, or transporting oil or other hazardous substances

immediately prior to a discharge of such oil or other hazardous substances onto the land or into the waters of the State and specifically shall include carriers and bailees of such oil or other hazardous substances.

N.C.G.S. § 143-215.77(5) (1987). Assuming *arguendo* that Alamance fits the definition of one "having control over" the gasoline, the forecast of evidence does not show that Alamance had "control" over the gasoline, in the language of the statute, less than ten years prior to the time this action was filed. Thus, Alamance had no "control" over the tanks at the Mini-Mart property after it was sold to Simmons on 26 January 1976, more than ten years before plaintiffs filed this action. The forecast of evidence shows that Alamance had no ownership of the tanks at the Warren property after it sold the property to J. R. Warren on 21 September 1971. Since Alamance had no ownership of the tanks at the Warren property, its last act was its last delivery of gasoline in March 1973, more than ten years before plaintiffs filed this action.

Plaintiffs and intervenor-plaintiffs in this case attempted to amend their complaints to include an action against Alamance. Since we have concluded that any action by the third-party plaintiffs against Alamance is barred by the statute of repose found in N.C.G.S. § 1-52(16), we also conclude that the trial court correctly denied plaintiffs' and intervenor-plaintiffs' motions to amend their original complaints to include Alamance.

Defendants Tompkins, Simmons, the Warrens, and the Estate of Riggan contend that the six-year statute of repose found in N.C.G.S. § 1-50(5) bars plaintiffs' actions against them. This statute provides in part:

No action to recover damages based upon or arising out of the defective or unsafe condition of an improvement to real property shall be brought more than six years from the later of the specific last act or omission of the defendant giving rise to the cause of action or substantial completion of the improvement.

N.C.G.S. § 1-50(5)a (1983). Defendants claim that the installation of these underground storage tanks constituted improvements to real property and therefore plaintiffs' claims are barred by this statute because the six-year period passed before these claims were filed. Thus, the crucial question is whether the installation of the

tanks constituted improvements to real property within the meaning of § 1-50(5).

In *Little v. National Service Industries, Inc.*, 79 N.C. App. 688, 340 S.E.2d 510 (1986), the Court of Appeals considered whether the redesigning and repair of a chair lift at an amusement park constituted an improvement to real property within the meaning of § 1-50(5). *Id.* at 692, 340 S.E.2d at 512. In doing so, the court had to determine whether the chair lift was considered real or personal property. If the chair lift was considered real property, N.C.G.S. § 1-50(5), the six-year statute of repose would apply, and if the chair lift was considered personal property, the statute would not apply because the improvements to the chair lift would not be considered improvements to real property.

In deciding whether the chair lift was real or personal property, the court looked to the law of fixtures and quoted the definition of a fixture found in 1 Thompson on Real Property, " '[a] fixture has been defined as that which, though originally a moveable chattel, is, by reason of its annexation to land, or association in the use of land, regarded as a part of the land, partaking of its character . . . .' " *Id.* (quoting 1 Thompson on Real Property, 1980 Replacement, § 55 at 179 (1980) ). The Court of Appeals then looked at the tests which are useful in resolving the issue of when a chattel attached to the real property becomes real property or remains personal property. The factors to be examined include: "(1) the manner in which the article is attached to the realty; (2) the nature of the article and the purpose for which the article is attached to the realty; and (3) the intention with which the annexation of the article to the realty is made." *Little v. National Service Industries, Inc.*, 79 N.C. App. at 692, 340 S.E.2d at 513 (citations omitted). In addition to these tests, "when additions are made to the land by its owner, it is generally viewed that the purpose of the addition is to enhance the value of the land, and the chattel becomes a part of the land." *Id.* at 692, 340 S.E.2d at 513 (citing *Belvin v. Paper Co.*, 123 N.C. 138, 31 S.E. 655 (1898); *Moore v. Valentine*, 77 N.C. 188 (1877) ). "On the other hand, where the improvement is made by one who does not own the fee, such as a tenant, the law is indulgent and, in order to encourage industry, the tenant is permitted 'the greatest latitude' in removing equipment which he has installed upon the ground." *Little v. National Service Industries, Inc.*, 79 N.C. App. at 693, 340 S.E.2d at 513 (citing *Overman v. Sasser*, 107 N.C. 432, 12 S.E. 64 (1890) ). When

the rights of a third party, who is unconnected to the land or the original transaction involving the annexation of the chattel, are concerned, the question is how the intent of the parties to the transaction is manifested to the third party through "physical facts and outward appearances." *Little v. National Service Industries, Inc.,* 79 N.C. App. at 693, 340 S.E.2d at 513.

[8] We now consider whether § 1-50(5) applies to Tompkins so as to bar plaintiffs' claims against him. When the Midway tanks at the Mini-Mart property were installed, Simmons, not Tompkins or Midway, owned the property. Thus, the presumption that the tanks were to become a part of the real property did not arise because the tanks were not installed by the owner of the land. The tanks were installed on Simmons' property pursuant to a contract which provided, "It is agreed that the title to all of the above described equipment shall remain in the Seller, and the same shall at all times remain personal property and shall not be or become a part of the real estate, notwithstanding its being affixed to the premises." The contract further provided, "It is understood and agreed that the Seller shall have the absolute rifht (sic), at any time within thirty (30) days after the termination of this contract, to remove the . . . storage tanks."

The intention of the contracting parties was that the tanks would remain personal property. This intention was evidenced by the terms of the contract between the parties, by the actions of the parties while the contract was in effect, and by the actions of the parties at the termination of the contract. During the term of the contract, Simmons, the owner of the property, was not responsible for the repair and maintenance of these tanks even though they were on his property. Furthermore, when the contract terminated, the tanks were removed from the ground and were taken away from Simmons' property. The terms of the contract and the actions of the parties both during the term of the contract and at its termination indicate that the parties never intended for the tanks to become a part of the land so as to pass with the real property; the tanks were to remain personal property. The fact that the tanks were removed from the land at the termination of the contract and were not a part of the real property at the time this action was filed is a manifestation of intent by "physical facts and outward appearances" that the tanks were not a part of the real property. Therefore, the installation of the tanks was not an improvement to real property within the meaning of § 1-50(5),

## WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

and the shortened liability period set out in that statute does not apply to Tompkins. Accordingly, the actions against Tompkins are not barred by the six-year statute of repose.

[9] We now consider whether plaintiffs' actions against the Warrens are barred by § 1-50(5). When the Warrens bought the property, the tanks were already in place, having been installed prior to the time Alamance purchased the property in January 1968. However, assuming *arguendo* that the installation of these tanks constituted improvements to real property, § 1-50(5) does not apply to the Warrens due to an exclusion found in § 1-50(5)d. The statute contains the following exclusion:

> The limitation prescribed by this subdivision shall not be asserted as a defense by any person in actual possession or control, as owner, tenant, or otherwise, of the improvement at the time the defective or unsafe condition constitutes the proximate cause of the injury or death for which it is proposed to bring an action, in the event such person in actual possession or control either knew, or ought reasonably to have known, of the defective or unsafe condition.

N.C.G.S. § 1-50(5)d (1983).

The exception found in this section is based on the continued duty of owners and tenants to inspect and maintain the premises. *Gillespie v. Coffey*, 86 N.C. App. 97, 356 S.E.2d 376 (1987). Furthermore, § 1-50(5) was not intended to limit the liability of persons in the Warrens' situation because it was "designed to limit the potential liability of architects, contractors, and perhaps others in the construction industry for improvements made to real property." *Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 427-28, 302 S.E.2d 868, 873 (1983) (interpreting similar language in an earlier version of the statute). This statute limits the liability for certain groups who might otherwise be subject to a longer statute of limitation. *Id.* at 427, 302 S.E.2d at 873. The exception in this statute indicates that the limited period of liability was not intended to apply to those in actual possession or control of the land if they knew or had reason to know of the defect.

The forecast of evidence shows that the Warrens were aware that these underground tanks were on their property. Since there is evidence that the Warrens knew about the tanks and since they have a duty to inspect these tanks to determine if they are leaking,

they "ought reasonably to have known[] of the defective or unsafe condition" if they had inspected the tanks. N.C.G.S. § 1-50(5)d. Therefore, there is a sufficient forecast of evidence as to what the Warrens knew or should have known so that the six-year statute of repose does not bar an action against the Warrens, and the applicable statute of limitations is found in N.C.G.S. § 1-52. We have already determined that § 1-52 does not preclude an action against the Warrens. This same analysis may be applied to both Simmons and the Estate of Riggan as to the Alamance tanks on the Mini-Mart property so that the six-year statute of repose does not apply to them either.

[10] Defendant Tompkins argues that he is not personally liable in this action because he was only acting in his capacity as corporate officer for Midway which is not a party to this action. Tompkins claims that this action is not the proper place to decide his personal liability as a corporate officer since the plaintiffs did not file suit against Midway because they did not find out until later that it was actually Midway which owned the tanks at the Mini-Mart. Tompkins' arguments fail for several reasons. A corporate officer can be held personally liable for torts in which he actively participates. *Minnis v. Sharpe*, 198 N.C. 364, 367, 151 S.E. 735, 737 (1930). "Corporate officers are liable for their torts, although committed when acting officially." *Id.* The forecast of evidence shows that Tompkins personally participated in the activities surrounding the delivery and sale of gasoline at the Mini-Mart property. He signed the contract which allowed Midway to install the tanks on the property; he generally oversaw the conducting of business there by Midway as well as by McLeod, which serviced the tanks and equipment and performed any repairs; and he signed the papers arranging for the deliveries of the gasoline to the property, supervised the account, and was the person contacted about the loss of gasoline from the tanks in 1978. The conflicting explanations for the loss of gasoline, i.e., whether the result of a spill or a theft, were sufficient to create a material question of fact sufficient to withstand a motion for summary judgment as to Tompkins' personal liability for the torts of nuisance and trespass even though he was acting in his corporate capacity. Furthermore, corporate officers "are liable for their torts regardless of whether the corporation is liable." *Id.* The fact that Midway is not in this action does not mean that Tompkins cannot be sued in his individual capacity even though he was president of Midway when the events leading to this action took place.

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

[11] Tompkins may also be liable to plaintiffs in his individual capacity under N.C.G.S. § 143-215.93 (1987). The statute provides strict liability for any "person having control over oil or other hazardous substances." N.C.G.S. § 143-215.93. *See also Biddix v. Henredon Furniture Industries, Inc.*, 76 N.C. App. 30, 331 S.E.2d 717 (1985). "Person" is defined in the statute to mean "any and all natural persons" as well as businesses. N.C.G.S. § 143-215.77(13) (1987). By defining "person" to include individuals as well as companies, the legislature provided for individual as well as corporate liability for those who had "control" over the source of the contamination. The evidence that Tompkins arranged the contracts, oversaw the business dealings, and personally participated in the activities surrounding the delivery and sale of gasoline to the Mini-Mart property permits a reasonable inference that Tompkins had "control" over the gasoline which was placed in the Midway tanks at the Mini-Mart property. The forecast of evidence concerning Tompkins' personal involvement in providing gasoline to the Mini-Mart property is sufficient to withstand a motion for summary judgment based on his liability under this statute. Thus, the Court of Appeals correctly reversed the trial court's grant of summary judgment in favor of Tompkins.

Defendants all contend that plaintiffs have not shown the proper causation between defendants' actions and the contamination. Each defendant claims that the plaintiffs have not demonstrated that the contamination in their wells was caused specifically by the leaking from that defendant's tanks. Plaintiffs contend that according to *Masten v. Texas Co.*, 194 N.C. 540, 140 S.E. 89 (1927), to survive summary judgment, all they must show is that their wells are contaminated and that defendants' tanks were sources of the contamination. Plaintiffs claim that under this rule, they do not have to show that each defendant was the actual cause of the contamination when there are multiple sources of contamination as in this case.

*Masten* involved contamination of plaintiff's well from an underground gasoline storage tank installed by defendant. Defendant's tank was the only gasoline tank within half a mile of plaintiff's home. *Masten*, 194 N.C. at 540, 140 S.E. at 89. While the evidence that defendant's tank contaminated plaintiff's well was only circumstantial because all the plaintiff could prove was that his well was contaminated and that defendant's tank was the only possible source of contamination in the vicinity of the well, this Court found

that the evidence was "more than a scintilla, and sufficient to be submitted to a jury." *Id.* at 541, 140 S.E. at 90. In *Broughton v. Standard Oil Company*, 201 N.C. 282, 159 S.E. 321 (1931), this Court discussed the requirements set out in *Masten* and stated, "In the action for the pollution of his well, all that the plaintiff was required to allege and prove was that his well was polluted by gasoline from the tank owned and maintained by the defendant." *Broughton v. Standard Oil Company*, 201 N.C. at 288, 159 S.E. at 324.

[12]　While *Masten* did concern only one possible source of contamination, we hold that where, as here, plaintiffs' forecast of evidence is that there are three sources of contamination, the forecast is sufficient to survive summary judgment as to each source. In holding that plaintiffs had failed to show any causation between the acts of the Warrens and the contamination of plaintiffs' wells, our Court of Appeals cited *Dedham Water Co. v. Cumberland Farms, Inc.*, 689 F. Supp. 1223 (D. Mass. 1988). We note that after our Court of Appeals' decision was filed, the First Circuit Court of Appeals overruled the federal district court decision. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146 (1st Cir. 1989). While *Dedham* deals with interpretation of a different statute, it is a case which involved more than one possible source of contamination. Quoting a district court case affirmed by the Third Circuit, the First Circuit explained in *Dedham* that it would be doubtful that the plaintiff could prove that the contamination came directly from one of the two potential sources of contamination. "To impose such a requirement might permit the owners and operators of both facilities to avoid financial responsibility for the cleanup, and would thus eviscerate [the statute]." *Id.* at 1154 (quoting *Artesian Water Co. v. Government of New Castle County*, 659 F. Supp. 1269, 1282 (D. Del. 1987), *aff'd*, 851 F.2d 643 (3d Cir. 1988). The First Circuit vacated the district court's judgment in favor of the defendant and awarded plaintiff a new trial as to liability and damages under the statute in question. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d at 1157.

We conclude that plaintiffs have forecast sufficient evidence of causation through the NRCD report that their wells are contaminated and that defendants' tanks were probable sources of the contamination.

[13]　Defendants all contend that they are not responsible for any contamination in the Hills' and Paguras' wells because the forecast

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

of evidence indicates that these wells are located uphill from all of the underground tanks. The Hills contend that the map of the topography of the area indicates that the flow direction of the upper aquifer goes from the Warren property directly toward the Hill property. The flow directions on this map did not include the Pagura property because the map was drawn before the contamination in the Paguras' well was discovered. The Hills and the Paguras also contend that even though their property is uphill from the Mini-Mart property, there could be a lower aquifer below the upper aquifer with a different flow direction from that of the upper aquifer whose flow direction has been pinpointed by the NRCD studies. These plaintiffs claim that the depositions of the experts do not foreclose the possibility of the existence of this lower aquifer whose flow direction might bring the contamination to the Hill and Pagura properties from the Mini-Mart property which is a greater distance away from the Hill and Pagura properties than the Warren property and which is "downhill" from the Hill and Pagura properties.

We agree that the flow direction from the Warren property to the Hill property suggests that the Warren tanks are a source of the contamination for the Hill and Pagura wells. Even though the flow lines were not completed on the map to include the Pagura property, there is enough circumstantial evidence, when location is considered, to constitute a sufficient forecast of evidence that the Warren tanks were a source of contamination for the Pagura well. The evidence is clear that the Pagura well is contaminated and that the Pagura property, which is adjacent to the Hill property, is not located at a higher elevation than the Hill property. The flow direction indicated on the map is also a sufficient forecast of evidence to indicate that the Warren tanks could also be a source of the contamination in the Wilson and White wells. However, plaintiffs have not presented a sufficient forecast of evidence to support their theory of the lower aquifer which would have made the Mini-Mart tanks a source of contamination for the Hill and Pagura wells.

In her deposition, Brenda Smith, an employee with the NRCD group which prepared the data on the possible sources of contamination and the flow directions of the underground aquifer, was asked, "as you go down the water table, does the water flow in different directions?" Her response was, "[i]t's possible." The questioning continued:

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

Q. Therefore, if the contamination from any of the sources that you've identified had reached a depth lower than the ten feet that you're testing —

A. Right.

Q. — your flow directions may not be accurate; is that what you're saying?

A. No that's not what I'm saying.

Q. The flow directions at the depth where the contamination is may not correspond to the flow direction you have on that map?

A. That's possible — yes.

Without more data in support of it, the answer, "that's possible," when asked if the flow direction could be different below the level where the NRCD had tested, is a slender reed upon which to base causation. It is not a sufficient forecast of evidence to survive the summary judgment motion by Tompkins, Simmons, and the Riggan Estate as to the Hills and the Paguras, especially in view of Ms. Smith's deposition testimony that her office would have to dig more monitor wells and perform further tests to be able to answer questions of causation beyond what was in the NRCD report. Further deposition testimony indicated that NRCD had no plans to dig additional monitor wells or to perform further tests. To allow a jury to consider the question of whether there is a lower aquifer flowing in a different direction, when the only expert testifying on this matter refuses to answer that very question based on the data collected, is improper. Since there was no forecast of evidence tending to show the existence of a lower aquifer flowing in a different direction, summary judgment for Tompkins, Simmons, and the Riggan Estate, as against the Hills and the Paguras, was properly granted by the trial court, and the Court of Appeals' holding to the contrary is reversed.

[14] The Court of Appeals held that the trial judge's denial of plaintiffs' motion to amend their complaint to include as defendants the Warrens, who were already third-party defendants, was not an abuse of discretion. *Wilson v. McLeod Oil Co.*, 95 N.C. App. at 491, 383 S.E.2d at 399. Plaintiffs contend that the Court of Appeals erred in upholding the trial court's denial of their motion to amend their complaint. As the Court of Appeals correctly noted,

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

"[a] motion to amend [made after responsive pleadings have been filed] is addressed to the sound discretion of the trial court and should be reversed only upon a finding of abuse of discretion." *Wilson v. McLeod Oil Co.*, 95 N.C. App. at 491, 383 S.E.2d at 399 (citing *Carolina Garage Co. v. Holston*, 40 N.C. App. 400, 253 S.E.2d 7 (1979) ). After hearing various motions filed by the numerous parties in this case on 29 March 1988, the trial judge notified counsel by letter dated 4 April 1988 of his rulings on all of the motions, including the motion to amend the complaint. The effect of the judge's rulings was to grant summary judgment to all defendants, thus disposing of the case in the superior court. We have now held that several of plaintiffs' claims survived summary judgment. We believe that the trial court denied the motion to amend as to the Warren third-party defendants under the mistaken belief that none of plaintiffs' claims were valid and that granting the amendment would indeed result in unnecessary delay and additional expense to the parties. Since the judge's order was signed under a misapprehension of the law, we believe the better approach is to vacate the order and remand for reconsideration of plaintiffs' motion to amend as to the Warren third-party defendants in light of our opinion in this case relating to the validity of the various causes of action.

For the reasons stated above, the Court of Appeals' holdings that (1) Ms. White's trespass and nuisance claims are barred by the statute of limitations is reversed; (2) Ms. White's negligence and statutory claims are barred by the statute of limitations is affirmed; (3) the trial judge did not abuse his discretion in denying plaintiffs' motion to amend their complaint to include the Warrens is modified as stated herein; (4) there was no abuse of discretion by the trial judge in denying plaintiffs' motion to amend their complaint to include Alamance is affirmed; (5) summary judgment was properly granted in favor of Alamance is affirmed; (6) summary judgment was improperly granted in favor of Tompkins, Simmons, and the Estate of George Riggan as to the Hills and the Paguras is reversed but is affirmed as to the Wilsons; (7) summary judgment was properly granted in favor of the Warrens as against Tompkins, Simmons, and the Estate of George Riggan is reversed; and (8) summary judgment was properly granted in favor of Hilda Baxter, individually and as personal representative of her husband's estate, is affirmed.

The decision of the Court of Appeals is affirmed in part, reversed in part, modified in part, and remanded to that court for

WILSON v. McLEOD OIL CO.

[327 N.C. 491 (1990)]

further remand to the Superior Court, Alamance County, with directions to vacate that portion of the order of the trial court dated 4 April 1988 denying plaintiffs' and intervenor-plaintiffs' motion to amend complaint to include the Warren third-party defendants as defendants, and for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, modified in part, and remanded.

Justice MEYER dissenting.

First, I cannot agree with the majority that summary judgment was improperly entered for the defendant Loren A. Tompkins. Even if, as between the parties, the tanks were to be considered as personal property, they were nevertheless "an improvement to real property" within the meaning of N.C.G.S. § 1-50(5), the six-year statute of repose, and any action against Tompkins is barred by that statute. The applicability of the statute is not determined by whether the tanks became "fixtures" or remained, for purposes of contract, personal property. Statutes of repose operate inexorably without regard to the intent or agreement of the parties. Tompkins' last action with regard to the tanks in question occurred, and indeed those tanks had been removed from the property, more than six years before this action was begun.

More importantly, I believe the majority has erred in its reliance on *Masten v. Texas Co.*, 194 N.C. 540, 140 S.E. 89 (1927), and *Broughton v. Standard Oil Company*, 201 N.C. 282, 159 S.E. 321 (1931). The holding in both of those cases was that the plaintiff must "allege *and prove* that his well was polluted by gasoline from the tank *owned and maintained by the defendant*." *Broughton*, 201 N.C. at 288, 159 S.E. at 324 (emphasis added). Plaintiffs' forecast of evidence fails in this respect. The NRCD report did not fix the source of the contamination. Any fair reading of that report reveals that it merely identifies the three tank locations in question as "potential" sources.

This is not a case where, as in *Masten*, there is only one possible source of the contamination. Plaintiffs' forecast of evidence produces only speculation that one or more of three "potential" sources was the cause of the contamination.

**WILSON v. McLEOD OIL CO.**

[327 N.C. 491 (1990)]

The majority also errs in its reliance on *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146 (1st Cir. 1989). That case, as the majority concedes, involved an entirely different statute. It, in fact, involved an entirely different concept of liability. There, the plaintiff was attempting to recover "response" costs under a federal statute under which it was not necessary in order to support a recovery that the contamination actually reach the plaintiff's land. That is not the case under the statutory and common law theories upon which these plaintiffs are proceeding.

Like Judge Wells in his dissent below, I wish to emphasize that, in my opinion:

> (1) there remain issues of fact as to the identity of the actors in the alleged escape or leakage of oil or gasoline, and (2) that only those actors responsible for escape or leakage may be liable under the theories advanced in this case. I do not accept the possible inference that a subsequent owner of facilities from which a *previous* escape or leakage has occurred may be liable for continued seepage resulting from the previous escape or leakage over which he had no control.

*Wilson v. McLeod Oil Co.*, 95 N.C. App. 479, 494, 383 S.E.2d 392, 400 (1989) (Wells, J., dissenting).