UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

STATE OF NORTH CAROLINA, ex rel.
R. Wayne McDevitt, Secretary,
North Carolina Department of
Environment and Natural Resources,
*Plaintiff-Appellee,*

v.

ACME PETROLEUM AND FUEL
COMPANY; PACEMAKER LEASING
COMPANY,

*Defendants-Appellants.*

No. 01-1665

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CA-98-505)

Argued: January 24, 2002

Decided: March 19, 2002

Before WILKINSON, Chief Judge, and LUTTIG and
MICHAEL, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** John Adams Hodge, HAYNSWORTH, SINKLER &
BOYD, P.A., Columbia, South Carolina, for Appellants. Thomas

James Pitman, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Richard S. DeGeorge, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina; Boyd B. Nicholson, Jr., HAYNSWORTH, SINKLER & BOYD, P.A., Greenville, South Carolina, for Appellants. W. Wallace Finlator, Jr., NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Defendants Acme Petroleum and Fuel Company and Pacemaker Leasing Company appeal from a judgment ordering them to reimburse the State of North Carolina for the State's costs in providing alternate water to residents of several households whose well water was contaminated by petroleum leaks from defendants' underground storage tanks. The State provided the alternate water pursuant to its authority under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6991b(h)(2)(B), and it sought reimbursement pursuant to 42 U.S.C. § 6991b(6)(A) and N.C.G.S. § 143-215.94. We affirm.

### I.

In October 1992 Frances Robertson complained to the Gaston County Health Department (GCHD) that her water smelled like gasoline. The Robertson well was tested, and its water was found to contain benzene contamination of 3,464 parts per billion (ppb). Benzene is a component of gasoline. Concentration levels above 5 ppb present a health risk to humans and violate federal drinking water standards; levels above 1 ppb violate North Carolina standards. The GCHD and the U.S. Environmental Protection Agency (EPA) traced the contami-

nation to leaking underground storage tanks (USTs) at a site called Gilliland's Place, a gasoline station and convenience store. The USTs were owned by Acme Petroleum and Fuel Company and operated by Pacemaker Leasing Company. (For convenience we will refer to these two companies as "Acme.") GCHD and EPA tested a number of other residential wells in the area and found that seven more wells down gradient from the USTs were also contaminated by benzene. Five showed benzene levels significantly greater than the federal drinking water standard of 5 ppb.

North Carolina's State Toxicologist, Dr. Kenneth Rudo, evaluated the health risk posed by the contaminated well water. Dr. Rudo concluded that the water was highly contaminated and should not be used for drinking, cooking, or bathing. In the comments section of the health risk evaluation form sent to the affected households Dr. Rudo wrote: "Please do not use the water for ANY purposes as any exposure may pose a significantly increased health and cancer risk over time. DO NOT USE THIS WATER!" After reviewing the evaluations, Linda Blalock, project manager in the Federal Trust Fund Program in the North Carolina Department of Environmental and Natural Resources (DENR), decided that prompt action was necessary. Under RCRA a state may take corrective action, such as providing alternate water supplies, if prompt action is necessary to protect human health and the environment. 42 U.S.C. § 6991b(h)(2)(B). Accordingly, Blalock ordered bottled water and rented point-of-entry carbon treatment filter systems for the affected households. With the exception of one household where retesting of the well was necessary, all affected households received alternate water supplies within about five to ten weeks.

RCRA provides that owners or operators of leaking USTs are liable to the State for the costs of corrective action. 42 U.S.C. § 6991b(h)(6)(A). However, when DENR sought reimbursement from Acme, the company refused to pay, arguing that the State should seek reimbursement directly from the North Carolina Commercial Leaking Petroleum Underground Storage Tank Cleanup Fund (the Commercial Fund). The Commercial Fund is administered by the State and operates like an insurance program: owners and operators of leaking commercial USTs who have paid the applicable premiums may have the Commercial Fund pay for (a) "cleanup of environmental damage"

costs above a deductible of $20,000 or $50,000 and (b) "compensation to third parties for bodily injury and property damage" above a $100,000 deductible. *See* N.C. Gen. Stat. § 143-215.94B(b)(1)-(5). Acme was covered by the Commercial Fund and had satisfied its "cleanup of environmental damage" deductible. In fact, the Commercial Fund had already paid out $739,589.17 in cleanup costs for the contamination at Gilliland's Place. Acme argued that the alternate water costs were cleanup costs, and since Acme had met its deductible for cleanup costs, any payments to the State should come directly from the Commercial Fund.

The State of North Carolina sued Acme in the Superior Court of Gaston County on October 5, 1998, seeking to recover from Acme the $96,844.38 (plus interest) the State spent in providing alternate water (bottled water and point-of-entry carbon treatment systems) to the five households whose well water was contaminated above federal drinking water standards. Acme removed the case to the United States District Court for the Western District of North Carolina. After the parties cross-moved for summary judgment, the district court held an evidentiary hearing to assist in its determination of whether the State was justified in taking corrective action under 42 U.S.C. § 6991b(h)(2)(B). After considering the evidence, the court determined (1) that due to the benzene levels in the water wells prompt corrective action by the State was necessary to protect human health and the environment and (2) that the State acted promptly to provide alternate water to the affected households. As a result, the district court determined that the State could seek reimbursement for the costs of the corrective action taken. Later, the district court granted summary judgment to the State and entered final judgment against Acme for $137,573.78, an amount equal to the alternate water supply costs plus interest as of January 22, 2001. Acme appeals, raising two questions: (1) whether RCRA authorized the State to provide the alternate water supplies and (2) whether Acme had met its deductible, requiring the Commercial Fund to cover the alternate water supply costs.

## II.

Acme first argues that DENR exceeded its authority under RCRA when it provided alternate water supplies. We disagree. RCRA autho-

rizes a state to take corrective action if prompt action is necessary to protect human health and the environment:

> [The State] may undertake corrective action with respect to any release of petroleum into the environment from an underground storage tank only if such action is necessary, in the judgment of the [State], to protect human health and the environment and one or more of the following situations exist:
>
> . . .
>
>> (B) A situation exists which requires prompt action by the [State] under this paragraph to protect human health and the environment.

42 U.S.C. § 6991b(h)(2). Corrective action may include providing alternate household water supplies. 42 U.S.C. § 6991b(h)(5).

Acme argues that DENR's actions were unauthorized because there was no situation calling for prompt action and the State never declared that prompt action was necessary. In light of the extremely high levels of benzene contamination and the State Toxicologist's determination that any continued use of the water would be harmful to human health, this argument is without merit.

Acme also argues that the State was not authorized to act because it did not in fact take prompt action. According to Acme, the State's slowness to act suggests that prompt action was not really necessary. The statute does not require that the response actually be prompt; it only requires that there be a need for a prompt response. Even if it is assumed that the State did not act promptly, that does not mean that there was no need for prompt action. The high level of benzene contamination in the water wells posed a significant risk to human health and the environment. Prompt action by the State was therefore required, and the statutory condition was satisfied. In any event, the district court determined that the State took prompt action in providing alternate water, and the evidence supports that determination. Several steps were involved. Water samples were taken from the

wells and delivered to a laboratory for testing and analysis. The analyses were forwarded to the State Toxicologist, who prepared health risk evaluations. These evaluations were sent to a project manager in DENR, who determined that prompt action was necessary. The project manager then authorized the provision of alternative water supplies and contacted a vendor to arrange for delivery of bottled water and the installation of filters at the affected households. With the exception of one household where retesting was required, the affected households received alternative water supplies within about five to ten weeks. Given the steps required, this evidence supports the district court's conclusion that the State took prompt action.

Because Acme's leaking USTs created a situation that required prompt action to protect human health and the environment, RCRA authorized the State to provide alternate water supplies for the affected households.

### III.

Next, Acme argues that under North Carolina law alternate water supply costs are "cleanup of environmental damage" costs subject to a $20,000 deductible and not "compensation to third parties for bodily injury and property damage" subject to a $100,000 deductible. Contrary to Acme's assertion, the alternate water supply costs are properly classified as compensation to third parties for property damage. Because Acme had not met the required "compensation to third parties" deductible, the district court correctly concluded that it could not order direct payment from the Commercial Fund.

The distinction between "compensation to third parties for . . . property damage" and "cleanup of environmental damage" costs is governed by North Carolina law. RCRA allows a state to implement its own program to respond to releases from USTs if the program is "equivalent to" and "consistent with" the federal requirements and standards and provides for "adequate enforcement." 42 U.S.C. § 6926(b). North Carolina has a federally approved UST program, and its regulations parallel the federal ones. North Carolina General Statute § 143-215.94G(a) authorizes the State to provide alternate sources of drinking water to third parties when prompt action is

required. In addition, the State may seek reimbursement for these alternate water costs. N.C.G.S. § 143-215.94G(d).

North Carolina law allows direct reimbursement from the State's Commercial Fund, but only if the deductibles have been met. N.C.G.S. § 143-215.94E(b). Acme does not dispute that it must first reach the deductible. Rather, Acme argues that the costs of providing bottled water and carbon filters are "cleanup of environmental damage" costs and that it has already met its $20,000 deductible for these costs. Acme's argument fails because North Carolina law categorizes alternate water supplies as compensation to third parties. As mentioned above, N.C.G.S. § 143-215.94G(d) deals with reimbursement for costs of alternate water supplies. It reads:

> The Secretary [of DENR] shall seek reimbursement through any legal means available, for:
>
> . . .
>
> (3a) The amounts provided for by G.S. 143-215.94B(b)(5) required to be paid by the owner or operator to third parties for the cost of providing interim alternative sources of drinking water to third parties and the initial cost of providing permanent alternative sources of drinking water to third parties.

N.C.G.S. § 143-215.94B(b)(5), in turn, provides:

> The Commercial Fund shall be used for the payment of the following costs . . .
>
> (5) Compensation to third parties for bodily injury and property damage in excess of one hundred thousand dollars ($100,000) per occurrence.

In sum, alternate water supplies are considered to fall under N.C.G.S. § 143-215.94B(b)(5), and that section covers compensation to third parties and has a $100,000 deductible.

Despite the statutory language, Acme maintains that the higher deductible does not apply because alternate water supplies cannot be considered compensation to third parties for property damage because (a) no third party has brought a claim for property damage and (b) private parties do not "own" groundwater in North Carolina, which means that the contamination of groundwater cannot constitute property damage. There is no suggestion in the governing statutes that third parties (here, homeowners with contaminated water) must make formal claims before the State expends monies to compensate them by providing alternate water supplies. In this case the State did testing, established contamination, and provided alternate water to several households after one homeowner complained that her water smelled like gasoline. More formal claims from the third parties were not necessary to trigger the State's response. Furthermore, North Carolinians have the right to beneficial enjoyment of groundwater on their property, and it is well established that private parties have a claim for contamination of their well water. For example, in *Wilson v. McLeod Oil Co.*, 398 S.E.2d 586 (N.C. 1990), the plaintiffs brought statutory claims under the Oil Pollution and Hazardous Substances Control Act, codified at N.C.G.S. § 143-215.93, as well as claims for trespass, nuisance, and negligence when gasoline seeping from underground tanks contaminated their water supply. *See also James v. Clark*, 454 S.E.2d 826 (N.C. Ct. App. 1995) (same); *Ellington v. Hester*, 487 S.E.2d 843 (N.C. Ct. App. 1997) (same). Contamination of groundwater thus constitutes property damage.

Even if the North Carolina statutes did not so clearly classify alternate water costs as "compensation to third parties," those costs more naturally belong under that heading than under "cleanup of environmental damage." Providing bottled water and point-of-entry water filters to individual households does not reduce contamination to the soil or groundwater or otherwise clean up the environment. Instead, the alternate water attempts to compensate the third parties harmed by the contamination. Because the alternate water costs are "compensation to third parties for . . . property damage," Acme is not entitled to indemnity from the Commercial Fund until the $100,000 deductible has been met.

IV.

We affirm the judgment entered in favor of the State against Acme Petroleum and Fuel Company and Pacemaker Leasing Company for

$137,573.78, representing the State's costs (plus interest) in providing bottled water and filtration systems to households whose well water was contaminated with benzene from the defendants' USTs.

*AFFIRMED*